Brockenbrough, J.
delivered the opinion of the General Court. He stated the case, and then said:
In answer to the first question, it may be remarked, that the whole system of our judicial polity is founded on the idea that the Inferior Tribunals are bound by the decisions *662 of the Supreme Appellate Tribunal. There should be an uniformity of construction of the same law throughout the State, and this cannot be attained, without giving: to the Appellate Court a superintending and controlling influence over tjje judgments of the Inferior Courts. It is not denied, that if the decision of the Highest Tribunal has been made by a divided Court, or upon a first impression, or it becomes doubtful whether the decision will be adhered to, upon a re-consideration of it, the Inferior Judge, if he thinks it erroneous, may adjourn the question again, or may give a judgment contrary to it, for the purpose of having it re-viewed by the Supreme Tribunal. But, in general, the decision ought to be respected and obeyed. The same rule ought to prevail in Criminal as in Civil cases. If a construction of a law favorable to the accused, has been given by the General Court, there can be no doubt that the Judge of the Circuit Court ought not to disturb it; and if one unfavorable to him has been rendered, there is, perhaps, a stronger reason why the Circuit Court should yield its own opinion. In the former case, if the Circuit Judge refuses to carry into effect the decision of the General Court, the prisoner may except to his opinion, and his judgment may be re-viewed, and another opportunity will thereby be afforded to the Appellate Tribunal to re-consider its own opinion, but in the latter case, if the former decision of the General Court is disregarded, the case is at an end, because the Commonwealth’s Attorney cannot except to any opinion of the Court; nor will a Writ of Error lie in behalf of the Commonwealth to an erroneous judgment of a Court given in favor of a prisoner.
This brings us to the second question, namely: Whether, under our present act against Mayhems, a free person shall be deemed guilty of felony, who maliciously or unlawfully shoots a slave ?
Dolly Chappie’s Case, 1 Virg. Cases, 184, was decided by the unanimous judgment of the seven Judges who were present, after an argument from the counsel for the pri *663 soner, and the Commonwealth. That decision was founded on the, act of 1803, which declared, that “ whosoever shall wilfully, maliciously, and of purpose stab, or shoot another,” with intention, &c. such offender shall be sentenced to a confinement in the Penitentiary, &c. The Court decided that, a slave was a person on whom the offence of stabbing and shooting might he committed, and that the act was intended to protect slaves as well as free persons from such outrages. The same language is used in the act of 181.9; and as the Legislature had the decision in Dolly Chappie’s Case before them when they revised all the laws on the subject of Mayhem, and did not think proper to use plain words by which to exclude slaves from the protection of the act, wo are of opinion that the same construction should now be adhered to, as in that case.
it has been supposed, however, that the words “ being free,” in the present act, do shew an intention in the Legislature to exclude slaves from the operation of the act. To give it this effect, however, it is necessary to dislodge the words “ being free,” from their present place in the section, and place them immediately after the word “ whosoever,” in the beginning. Thus transposed, the act would read thus: “ Whosoever being free, shall shoot or stab another:” and it is supposed that the word another, has relation to the words “ being free,” so as to declare that whosoever being free shall shoot or stab another, being free, such offender shall he punished in the way provided for by the act. Wc da not see the necessity for such a violent transposition of the words of the section. Placed as they are by the Legislature, they seem to be as plain as language can be made. There are in this country two classes of offenders, as to whom, the Legislature, from motives of public policy, have thought proper to prescribe different punishments for the same offence: these are the free man, and the slave. The former may be sent to the Penitentiary, the latter may not The Legislature, therefore, thought it necessary in the revisal of 1819, to make a dis *664 tinction between these two classes of offenders, and in the act under discussion, they have appropriated the two first sections to a specification of the acts declared felonious, and a denunciation of a certain punishment on free persons w]10 commit those offences; and the third section provides a different punishment for the slave who shall commit either of the offences in the two first sections mentioned. The language of the act then is plainly this: that “ whosoever” that is, whatever person “ shall shoot, or stab another,” that is, another person, “ every such offender being free, his or her counsellors, aiders and abettors, being free,” shall be a felon, and punished by confinement in the Penitentiary; but, if any slave shall commit any of the said of-fences, he is declared a felon, and shall suffer as in case of felony.
It has also been supposed, that the proviso in the first and second sections proves, that the Legislature did not intend that a free person shall be punished for maiming a slave. This objection, or a similar one, was made in Dolly Chappie’s Case, and overruled. The giving an action to the party grieved, as in case of trespass, was intended as a benefit to him; but, the incapacity of a slave to bring an action, and his consequent inability to receive the benefit, should not exempt the guilty person from the punishment provided by law for the offence. An alien enetny is entitled to protection, whilst he is permitted to remain in the country, yet he cannot maintain an action during the war: it cannot for a moment be supposed that he may be shot, stabbed, disfigured or disabled, without subjecting the offender to the other pains and penalties of the act.
The other proviso is, that the party grieved shall be a competent witness. The case before mentioned explains why this provision was made in the act of 1803. It appears to have been copied into the act of 1819, without any necessity, because the law which gave a part of the fine to the person grieved, being changed, there could not be any interest in him which would render him an incompetent *665 witness: but, the carelessness of the draftsman of the bill, in retaining an unnecessary proviso, affords no reason for believing that the Legislature intended to exclude the per sons of slaves from the protection of the act. If such had been their intention, it would have been easy to have made the exclusion by a direct provision, instead of leaving it to a far-fetched inference.
The distinction between free persons and slaves, was present to the legislative mind: they provided a different punishment for the two classes, when they were offenders. If they had intended to make the same distinction as to the persons offended against, they would have employed the same clear language.
It may further be remarked, that there appears no reason, arising from the relative situation of master and slave, why a free person should not be punished as a felon for maiming a slave. Whatever power our laws may give to a master over his slave, it is as important for the interest of the former, as for the safety of the latter, that a stranger should not be permitted to exercise an unrestrained and lawless authority over him. It is for the benefit of the master, and consoling to his feelings, that a third person should be restrained under the pains and penalties of felony, from maiming and disabling his slave.
The following is to be entered as the judgment of the Court.
This Court is of opinion, and doth decide, 1. That it is true as a general proposition, that in a criminal prosecution, wherein the judgment of the presiding Judge, if given in favor of the prisoner, would acquit him of the offence for which he is indicted, the Judge of the Circuit Court ought to suffer his individual opinion to be overruled by the previous opinion and judgment of the General Court in an analogous case; and particularly, that the decision of the General Court iu Dotty Chappie’s Case, ought to have such controlling influence in this case.
*666 2. That the judgment ought not to be arrested in the present case; and that a negro slave is a subject or person, on whom a free person can commit the offence created by grs(. anc¡ secon(j sections of the act, intituled “an act re¿[uce ¡nto one act, the several acts against malicious and unlawful shooting, stabbing, maiming and disfiguring,” passed February 9th, 1819; which is ordered to be certified to the Superior Court of Law for Cumberland county.